## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STEVEN ADAMS,**

    **Plaintiff,**

**v.**                     **Case No.  3:23-cv-3882-MCR-HTC**

**CAPT. JOSEPH I. SCHROCK, SGT. MICHAEL C. TONA, SGT. CODY L. SAINT, OFCR. BENJAMIN E. LEWIS, individually, CENTURION OF FLORIDA, LLC, MHM HEALTH PROFESSIONALS, LLC, health care corporations, CHRISTINE NOBLES, GERALD AMATUCCI, KELLY WEXLER, SUMMER SEALY, and TROY WILCOXSON, individually**

    **Defendants.**

_____/

## <u>ORDER</u>

Plaintiff Steven Adams, formerly an inmate in the custody of the Florida Department of Corrections ("FDOC"), brought suit against Centurion of Florida, LLC ("Centurion") and MHM Health Professionals, LLC ("MHM"), both of which allegedly share a contractual relationship with FDOC to provide health care services to its inmates.[1]  Adams's suit also names four correctional officers, four Centurion

---

[1] Centurion is a subsidiary of Centene Corporation and has contracted with FDOC to provide inmates' medical care since 2016.  MHM is owned by MHM Services, Inc., which is also a wholly owned subsidiary of Centene Corporation.  MHM is responsible for providing staffing services related to Centurion's contract with FDOC.

Utilization Management ("UM") Reviewers, and one Centurion medical provider, all in their individual capacities. Adams alleged violations of 42 U.S.C. §§ 1983 and 1988 arising out of his placement in a cell with a psychiatrically troubled and violent cellmate, injuries suffered in an attack by the cellmate, and deficient follow-up medical care. Defendants Christine Nobles, Dr. Gerald Amatucci, Kelly Wexler, Summer Sealy, and Troy Wilcoxson, who are all Centurion employees, moved to dismiss Adams's Second Amended Complaint ("SAC"). ECF No. 47. Nobles, Amatucci, Wexler, and Sealy are UM Reviewers responsible for reviewing and managing Adams's medical care requests. Wilcoxson is an Advanced Practice Registered Nurse ("APRN") and medical provider, who treated Adams. This is the second motion to dismiss in this action.[2]

## I.   Legal Standard

A motion to dismiss brought under Rule 12(b)(6) tests the legal sufficiency of a complaint. When deciding a Rule 12(b)(6) motion, the Court accepts the factual

---

[2] Defendants Centurion and MHM filed a Motion to Dismiss in November 2023. ECF No. 40. This was the first motion to dismiss filed in the case despite the SAC being Adam's second amended complaint. Much like Defendants' assertion here, Centurion and MHM moved to dismiss, in part, on the grounds that Adams failed to plead sufficient factual allegations in support of his deliberate indifference claim against the entities. The Court denied Defendants' Motion finding that the claims pled in the SAC against Centurion and MHM were sufficient. ECF No. 43. Notably, the Court stated that any potential resolution of whether Centurion and MHM had a policy or custom of deliberate indifference—which involved allegations regarding Nobles, Amatucci, Wexler, Sealy, and Wilcoxson's conduct—was "more appropriately suited for a summary judgment motion on a fully developed record." *Id.* at 16. Despite the Court's note, Nobles, Amatucci, Wexler, Sealy, and Wilcoxson move to dismiss Adams's SAC for strikingly similar reasons on which the Court has already ruled. Their Motion to Dismiss on these grounds is denied for the same reasons.

allegations of the complaint as true and considers whether the facts alleged are sufficient "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility is found where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678-79. All inferences derived from this factual content are drawn in a light most favorable to the plaintiff. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010); *see also Cruz v. Beto*, 405 U.S. 319, 321-22 (1972). While the Court is required "to draw on its judicial experience and common sense," it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft*, 556 U.S. at 678-79. That said, the threshold for a complaint to sufficiently state a claim for relief is low. *Soho Ocean Resort TRS, LLC v. Rutois*, No. 21-11392, 2023 WL 242350, at \*2 (11th Cir. Jan. 18, 2023) (citing *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir. 1983); *see also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

## II.   Background

On May 16, 2021, Adams was a prisoner at Santa Rosa Annex ("Annex") scheduled for release on March 18, 2022, after serving a two-year sentence. The Annex is an inpatient mental health unit located on the same compound as Santa Rosa Correctional Institution ("Santa Rosa"), a high security facility. Unlike what

is available at Santa Rosa, the Annex offers re-entry, incentivized recreation, substance abuse, and additional institutional betterment and vocational programming.[3]  Although Adams was initially assigned to the Annex and was not a gang member, he was sent to Santa Rosa where inmates are guarded more closely.[4] Adams was assigned to work as a staff canteen orderly while at Santa Rosa.

On the morning of May 8, 2021, a cook made Adams a sandwich, which he then placed in his cooler.  On his way back to the staff canteen, Adams was stopped by guards.  The guards asked him what was in his cooler, and he responded that it was a sandwich.  The guards accused him of lying and placed him in confinement with Andrea Banks, a psychiatric patient awaiting transfer.  Prison officers were

---

[3] The Court takes judicial notice of Florida governmental entities' description of the Santa Rosa Correctional Institution compound and the facilities therein.  *See* Office of Program Pol'y Analysis and Gov't Accountability*, Florida Correctional Facilities,* Rep. No. 19-08, 29 (2019), https://oppaga.fl.gov/Documents/Reports/19-08.pdf (last visited June 13, 2024); *see also* Fla. Dep't of Corr., *Santa Rosa Correctional Institution Annex*, https://fdc.myflorida.com/ci/135.html (last visited June 13, 2024); Fla. Dep't of Corr., *Santa Rosa Correctional Institution*, https://fdc.myflorida.com/ci/119.html (last visited June 13, 2024).

It is well established that courts may take judicial notice of documents that are publicly available on official government websites pursuant to Federal Rule of Evidence 201.  *See, e.g., McGuire v. Marshall*, 50 F.4th 986 n.20 (11th Cir. 2022) (holding Rule 201 allows judicial notice of publicly available information on a government website); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999) (affirming that a district court may take judicial notice of publicly available government records at the motion to dismiss stage); *Weaver v. United States*, 298 F.2d 496, 498 (5th Cir. 1962) (explaining that a court may take judicial notice *sua sponte*).  *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981).

[4] *Id.*

aware that Banks was a psychiatric patient and disciplinary confinement inmate, whereas Adams was an administrative confinement inmate awaiting a hearing.[5]

Banks displayed significant psychiatric problems, such as screaming, playing with feces, and speaking to nonexistent people.  Adams asked officers to be moved but was refused.  Instead, officers consistently antagonized Banks and attempted to create conflict between the two cellmates by depriving Banks of food while giving Adams food, contaminating Banks's food in front of him but not Adams's food, and telling Banks they were "letting the white boy shower" while refusing to let Banks shower.  Adams regularly and repeatedly asked to be transferred to a different cell, but his requests were denied despite Banks's increasingly erratic behavior.

On May 16, 2021, Banks told officers making rounds that he was experiencing homicidal thoughts and having a psychiatric emergency.  He further stated that he would hurt himself or Adams if he did not receive help.  Adams asked to be moved because Banks was mentally ill and threatening to kill him.  However, Captain Schrock told Adams that "[t]his is prison; that's not how this works," and left him in the cell with Banks.  That evening, Adams fell asleep in his cell.  At around 5:00 p.m., Banks brutally attacked him.  Adams received emergency medical care in prison by a medical provider with the assistance of an officer who found him unconscious after the attack.  The officer reported that he had to hold Adams's face

---

[5] The SAC does not state the purpose of Adams's upcoming hearing.

together because of the severity of the damage.  Adams's eyes were black, blue, and swollen shut.  His teeth were also broken, including some being broken below the gumline and down to the nerve.  Adams was taken to Sacred Heart Hospital, Pensacola, where he woke up later that same day.

At Sacred Heart Hospital, Adams received a preliminary ophthalmological examination.[6]  The examination identified: (1) a motility deficit in his left eye, likely requiring oculoplastic intervention, (2) enophthalmos, and (3) hypoglobus (defined by Adams as downward placement of the eyes); each injury was caused by the assault and affected his eye movement.  The examination noted that fracture repair surgery could not be undertaken until Adams's severe swelling reduced.  UM Reviewers Nobles and Amatucci refused to have Centurion pay for Adams to stay in the hospital for the days prior to surgery.  Specifically, Nobles declined to pay Sacred Heart Hospital's charges and stated, "Pt does not meet criteria for inpatient admission as requested by the hospital."  Amatucci confirmed that Centurion would not pay for Adams's continued admission because "waiting for swelling to go down could have happened at our infirmary."  Sacred Heart Hospital then discharged Adams prior to fracture repair surgery.[7]

---

[6] The Court's previous order provided a detailed overview of the technical medical terminology included in Adams's SAC.  *See* ECF No. 43 at 19-20.  Accordingly, the Court incorporates its summary of the medical terminology into the instant Order.

[7] The SAC does not state when Adams was discharged from Sacred Heart Hospital or the facility in which he was placed while his swelling reduced.

On May 21, 2021, Adams was sent to Memorial Hospital, Jacksonville because, according to the SAC, Centurion had a more favorable, cost-saving contract with that hospital.  Prior to his admission to Memorial Hospital, Wexler, another UM Reviewer, noted the need for Adams to receive an ophthalmology consult due to his blurry vision.  While at Memorial Hospital, Adams received a second ophthalmologic examination, but that examination was only for him to be "cleared for fracture repair from [an] ocular standpoint," and according to Adams, did not treat his eye injuries.  As part of that examination, medical staff noted that Adams was attacked with a "lock" or "hard object,"[8] explaining that the entire upper part of Adams's nose was broken away from his face and his palate was broken such that medical staff could look through the hole where the bridge of his nose had been and see the top of his tongue.  A surgeon also said Adams's broken nose was one of the worst he had ever seen.  It was also noted that Adams's left eye socket was broken, and his left pupil was so severely injured that his distance vision was 20/800 and near vision was 20/200.  His left ribs were fractured as well.  Despite his array of

---

As Adams explains in his Opposition to Defendants' Motion to Dismiss, Nobles and Amatucci's decision to decline payment for Adams's continued admission at Sacred Heart Hospital did not cause Adams to receive deliberately indifferent medical care.  Rather, these allegations support that Nobles, Amatucci, and the other UM Defendants controlled Adams's overall medical treatment, which he alleges was ultimately deliberately indifferent.  *See* ECF No. 48.

[8] Banks initially told officers that he attacked Adams with his hands.  However, Banks's hands did not show signs of striking Adams with great force.  Officers later searched the cell shared by Adams and Banks and found a heavy master combination lock.  Locks are known prison weapons.

injuries, Adams's facial fracture repair surgery could not be performed on the day of his admission to Memorial Hospital.  Nobles, Amatucci, and Wexler declined to have Centurion pay for Adams to remain at the hospital prior to surgery.[9]

On May 25, 2021, Adams was readmitted to Memorial Hospital and underwent open surgical reduction and internal fixation of his LeFort III fracture, left zygomaticomaxillary complex fracture, and complex nasal bone fracture. However, Adams's hospital records from both Sacred Heart and Memorial make clear that these procedures did not treat Adams's vision and dental injuries.[10]  On May 27, 2021, surgeons cleared Adams for discharge from Memorial Hospital with the proviso that he was to follow up with Dr. Anthony Massaro, one of his fracture repair surgeons, one week later.

On May 28, 2021, Adams was sent to the Hamilton Correctional Institution's ("Hamilton CI") Infirmary, where he remained until June 16, 2021.  On June 4, 2021, Adams was due for his follow-up appointment with Dr. Massaro, but Adams was not taken to see him.  A new request for a follow-up appointment with Dr. Massaro was sent to Centurion's UM group on June 8, 2021, but the medical records reflect

---

[9]  The SAC does not explain why fracture repair surgery could not be performed on May 21, 2021, or state where Adams was placed during the period between his release from Memorial Hospital on May 21st and his readmittance for his fracture repair surgery on May 25th.

[10]  At some point, Adams also had wires placed into his jaw.  However, the SAC does not state when Adams's jaw was wired, who performed the procedure, or why wires were needed. However, he does allege that the wires were removed while he was still incarcerated.

that the group did not respond to Adams's request.[11]  Sealy, a fourth UM Reviewer, noted Dr. Massaro's request to see Adams in one week; however, only removal of Adams's sutures at Hamilton CI's Infirmary was approved.[12]

While Adams does not contest that on July 12, 2021, Wilcoxson, an APRN for Centurion, scheduled him for a consultation with an optometrist, he alleges his vision problems could only be treated by an ophthalmologist, not an optometrist. Optometrists perform eye exams and vision tests, prescribe and dispense corrective lenses, detect eye abnormalities, and prescribe medications to treat eye conditions, but are not medical doctors.  *See* Fla. Stat. § 463.0055.[13]  Ophthalmologists are medical doctors, and in addition to performing the work optometrists perform, they provide surgical corrective vision services and perform surgery to treat other eye disorders.  Adams's July 12th optometrist consultation was less expensive than a consultation with an ophthalmologist and was supposed to be followed up with in three months.  However, no follow up occurred.

Eventually, Adams was returned to Santa Rosa[14] and placed in the custody of the same officers who previously oversaw him.  Certain prison staff told Adams that

---

[11] Adams does not clarify who made the June 8th request for him to return to Dr. Massaro for a follow-up appointment.

[12] The SAC does not state who approved removal of Adams's sutures.

[13] *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (stating that courts are "bound to take judicial notice" of state statutes).

[14] The SAC does not state when Adams was returned to Santa Rosa.

he would be placed back in confinement if he wrote to an attorney because "that is what they do" when prisoners write to attorneys. Adams was able to send photographs of his face to his home through his tablet before prison officials became aware of this and began blocking his emails.

While at Santa Rosa, Adams had issues with getting Santa Rosa medical staff to treat his injuries. He should have been sent to the Reception and Medical Center to have the metal plate in his mouth removed, but the procedure was delayed by prison medical providers and the plate was left in his mouth approximately eight weeks too long. On January 14, 2022, an urgent consultation request was made for Adams's ongoing vision problems. The request stated that Adams's "left eye [is] slow to react with pupil larger than right. Little to no reaction to light. Patient reports right eye floaters."[15] On the same day, Wilcoxson ordered a referral for Adams to see an optometrist for a second time despite Wexler noting in Adams's file in May 2021 that he needed ophthalmologic treatment for his severe eye injuries. In February 2022, prison medical providers performed an eye chart test on Adams and ordered him glasses that he received five days before his discharge in March 2022. The glasses also did not address his eye damage, which again required ophthalmologic care, not optometric care.

---

[15] The SAC does not state who made the consultation request, marked the request as urgent, or noted Adams's eye problems.

At no point following his fracture repair surgery in May 2021 was Adams ever taken: to a follow-up appointment with Dr. Massaro; to see an ophthalmologist to treat his eye injuries as noted by Wexler and as made evident by Adams's preliminary ophthalmological examination at Sacred Heart noting his traumatic eye injuries; or to a dental professional to repair his broken teeth that were broken below the gumline when wires were removed from in his jaw. According to Adams, other than the medical services he received as alleged in his SAC, no other medical care was provided to him before his March 2022 release. The lack of critical treatment for his injuries resulted in Adams receiving incomplete medical care for his eyes and other serious injuries while incarcerated.

Nobles, Amatucci, Wexler, and Sealy reviewed the recommendations of Adams's health care professionals for additional medical care and treatment and either delayed or denied them. The premature cessation of medical care has left Adams with sutures in his mouth to this day and has prevented him from transitioning to the rest of his medical treatment plan, including proceeding from oral and maxillofacial treatment to dental and ophthalmologic treatment. Adams now has scars from the tip of his nose extending over both eyebrows. During surgery, his upper lip was stitched to his upper gum, preventing him from moving his upper lip; those stitches are still in his mouth. He has broken teeth below the gumline and pain in the right upper part of his mouth caused by a tooth broken in

the assault that is missing all the way to the nerve.[16]  Adams's oral and dental issues should have been addressed while he was incarcerated, but he never received critical follow-up care to treat these injuries, which according to Adams, should have occurred after his fracture repair surgery.  He experiences serious ongoing pain and dysfunction in his jaw and eyes and still has back pain because of the attack.  He continues to experience severe anxiety, depression, and nightmares, and has been diagnosed with PTSD.  Adams still requires substantial dental care, eye procedures, and facial reconstruction surgeries.  He cannot see out of his left eye and has lost the opportunity for full restoration of the lost vision and facial reconstruction because these procedures were not undertaken sooner.  Because he is legally blind in his left eye, Adams is unable to continue his career as a mason—his profession for over 23 years prior to his two-year incarceration.

## III.   Discussion

Nobles, Amatucci, Wexler, Sealy, and Wilcoxson moved to dismiss Adams's SAC on the grounds that he failed to plead a claim of deliberate indifference pertaining to their conduct.  The Defendants allege that they were not responsible for ensuring that Adams received certain medical treatments or follow-up care, and any conduct they were responsible for was not deliberately indifferent.  Wilcoxson

---

[16] Adams alleges that an x-ray showed this damage to his tooth, but he does not clarify whether the x-ray occurred while he was incarcerated, who performed the x-ray, or the circumstances in which the x-ray was ordered.

also alleges that as an APRN, he would not have known that Adams needed an ophthalmologist, and the SAC merely second guesses his medical care decisions.

It is well settled that "deliberate indifference to serious medical needs of prisoners" is prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To plausibly allege deliberate indifference, a complaint must contain three components.  First, there must be an objective component alleged, meaning a serious medical need that has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (internal citations omitted).  Second, there must be a subjective component, meaning a serious medical need presenting a substantial risk of harm that is disregarded by the defendant through conduct that is more than gross negligence. *See Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).  Finally, there must be a causal connection between a defendant's conduct and the constitutional harm alleged.  *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall*, 610 F.3d 701).  This requires an allegation that a defendant personally participated in the conduct at issue and was consciously or callously indifferent to the deprivation.  *Zatler v. Wainwright*, 802 F.2d 397, 400-01 (11th Cir. 1986).

### A.      Objectively Serious Medical Need

Defendants do not dispute that Adams pled an objectively serious medical need.  Accordingly, the Court incorporates its previous finding that Adams had an objectively serious medical need, *see* ECF No. 43, and turns to whether he sufficiently pled the remaining elements of a deliberate indifference claim against these Defendants.

### B.      Subjective Knowledge of a Substantial Risk of Harm That is Disregarded Through Conduct That Is More Than Gross Negligence

#### i.      Subjective Knowledge

Subjective knowledge of a risk of serious harm exists when an official "knows of . . . an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1990).  In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

As discussed in detail above, Adams had severe injuries caused by Banks's assault, which according to Adams, required further treatment to multiple parts of his body.  Even after Adams underwent fracture repair surgery, his injuries persisted with many of them being visibly obvious.  As UM Reviewers for Centurion—the entity responsible for providing Adams' medical care—Nobles, Amatucci, Wexler,

and Sealy reviewed medical requests to treat Adams's injuries[17] and therefore, would have known of the obviously serious risk of harm. ECF No. 38 ¶¶ 82-86, 142-53, 155-56. Accordingly, the SAC sufficiently pled that UM Reviewer Defendants were subjectively aware of Adams's risk and his need for additional care.

Wilcoxson disputes his subjective awareness. He argues that as an APRN, he would not have appreciated that Adams needed to see an ophthalmologist, instead of an optometrist, to treat his eye injuries. As an initial matter, the SAC plainly alleged that Wilcoxson "reviewed requests for treatment of [Adams] and denied or delayed needed treatment." ECF No. 38 ¶ 142. The SAC further alleged that Wilcoxson provided deficient medical treatment by sending Adams to an optometrist despite having reviewed his medical records where multiple medical providers noted his need for *ophthalmologic* care. *Id.* ¶¶ 87, 147, 150, 154. The Court need not conduct further inquiry at this stage to conclude Adams has plausibly pled that Wilcoxson had subjective awareness of his serious medical need.[18] Additionally, determining whether an official had subjective knowledge "is a question of fact

---

[17] Defendants' Motion to Dismiss does not dispute that they were involved in reviewing Adams's medical care requests following the violent assault by his cellmate.

[18] The Court notes, however, that Florida law requires an APRN to have a current license to practice professional nursing and either a master's degree in a nursing clinical specialty area with preparation in specialized practitioner skills or a certification by an appropriate specialty board. *See* Fla. Stat. Ann. § 464.012. Once licensed, APRNs can treat patients by initiating appropriate therapies for certain conditions; ordering diagnostic tests; and referring patients to physical and occupational therapy. *Id.* Given the APRN licensing requirements, Wilcoxson's occupational status would not have impeded his subjective awareness of the severity of Adams's injuries and his need for ophthalmologic intervention.

'subject to demonstration in the usual ways.'" *Goebert*, 510 F.3d at 1327 (quoting *Farmer*, 511 U.S. at 842).   Whether any Defendant, including Wilcoxson, had subjective awareness of Adams's serious risk of harm is more appropriately addressed on a full record.

### ii.   Disregard of the Substantial Risk of Harm

Disregard of the risk occurs when an "official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.  Adams alleged that Nobles, Amatucci, Wexler, Sealy, and Wilcoxson disregarded his serious risk of harm by denying or delaying necessary follow-up medical care despite clear directives from his healthcare providers, as reflected in exam notes from Sacred Heart and Memorial hospitals as well as in notes from his vision assessments.  Specifically, Adams alleged Nobles, Amatucci, Wexler, and Sealy directly reviewed and evaluated his medical treatment requests, but nonetheless disregarded his serious risk by failing to: approve or respond to medical requests for him to return his surgeons one week after undergoing fracture repair surgery; schedule follow-up ophthalmologic care; schedule a follow-up appointment to his July 12, 2021 optometrist consultation even though an optometrist could not address his eye injuries; and provide dental care to address his severely broken teeth.  ECF No. 38 ¶¶ 142-48, 152-62.  Adams further alleged that Wilcoxson reviewed his medical records and disregarded his risk by referring him to an optometrist on July

12, 2021, and January 14, 2022, despite knowing Adams's traumatic eye injuries required an ophthalmologist.  *Id.* ¶¶ 87, 142, 150, 154.  Thus, Adams adequately pled that Defendants acted with disregard (or failed to act) because they knew his injuries would not be properly treated if he did not receive critical follow-up care.

Defendants argue that the SAC failed to plead that they disregarded Adams's risk because there are no allegations stating they were responsible for ensuring he was taken to medical appointments.  However, Defendants construe the allegations too narrowly.  Adams indeed alleged that Defendants were responsible for reviewing his medical requests and providing him access to medical treatment but wrongfully denied or delayed appropriate treatment in order to save costs.  *Id.* ¶¶ 82-87, 142-61. Specifically, Adams alleged that Nobles, Amatucci, Wexler, and Sealy reviewed and denied necessary medical treatment.  He also alleged that Wilcoxson, a medical provider responsible for Adams's treatment, referred him for a medically deficient but less expensive eye treatment.  Because Defendants denied or refused required care, Adams—*an in-custody inmate*—was not taken to necessary medical appointments and hence was denied critical medical care.  Thus, the SAC pled that Defendants were responsible for ensuring Adams went to required medical appointments.  At this point, Adams has pled enough to adequately allege that Defendants disregarded his risk.  Moreover, the "disregard of the risk is also a question of fact that can be shown by standard methods," and so, again, is more

appropriately addressed after establishing a full factual record.  *Goebert*, 510 F.3d at 1327 (quoting *Farmer*, 511 U.S. at 846).

### iii.    Conduct that is More than Gross Negligence

Providing medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" is conduct that is more than gross negligence, and thus, constitutes deliberate indifference.  *Dang ex rel. Dang v. Sheriff of Seminole Cnty.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Conduct may be more than gross negligence when an official delays medical care, takes an easier but less efficacious treatment, or provides care that is "so cursory as to amount to no treatment at all."  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).  Such conduct is more than gross negligence whether it is done by "prison doctors in their response to the prisoner's needs" or by a different prison official "in intentionally denying or delaying access to medical care."  *Estelle*, 429 U.S. at 104-05.

In his SAC, Adams alleged that Defendants knowingly provided him with inadequate treatment to avoid paying his medical care costs.   In response, Defendants argue that Adams failed to plead how these cost-saving measures fall below the constitutional standard.  While considering the cost of medical care does not give rise to a deliberate indifference claim by itself, officials must still provide

minimally adequate care that properly addresses an inmate's injuries; failure to do so violates the Eighth Amendment.  *See Hoffer v. Sec'y of Fla. Dep't of Corr.*, 973 F.3d 1263, 1275-77 (11th Cir. 2020).  For example, failing to provide or delaying treatment after a doctor deems it medically necessary falls below minimally adequate care standards, whatever the reason.  *See Estelle*, 429 U.S. at 104-05 (holding the Eighth Amendment forbids "intentionally interfering with the treatment once prescribed"); *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997) *overruled on other grounds*, *LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009) ("an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate."); *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994) (holding "inaction" despite "a prescribed course of care" is unlawfully inadequate care).  Here, Adams alleged that Defendants attempted to save costs by refusing to approve or provide access to medically prescribed treatments for his severe injuries.  ECF No. 38 ¶¶ 62, 76, 83, 87, 101-13, 142-61.  Furthermore, it is enough that Adams alleged that Defendants refused to provide him access to necessary medical care because it is well established that this conduct may be more than gross negligence.  *See Farrow*, 320 F.3d at 1245-48 (holding conduct is more than negligence when an official's delay with providing care results in an inmate's lifelong handicap); *see also McElligott*, 182 F.3d at 1255-59 (providing an inmate

with delayed medical treatment despite knowing the inmate has a serious medical need that would be exacerbated by the delay is more than negligence).  Moreover, Adams alleged specifically that Nobles, Amatucci, Wexler, and Sealy repeatedly refused to approve his medical care requests, which also may be conduct that is more than gross negligence.  *See Carswell v. Bay County*, 854 F.2d 454, 457 (11th Cir. 1988) (receiving a request for medical attention and intentionally refusing to provide medical care "has consistently been held to surpass negligence and constitute deliberate indifference"); *see also Fikes v. Abernathy*, 793 F. App'x 913, 922-23 (11th Cir. 2019) (affirming *Carswell* and *Goebert*).

Wilcoxson separately claims that Adams merely second guesses his medical care decisions. While pleading a simple difference in medical opinion—even when the opinion at issue constitutes ordinary medical negligence—is not enough, conduct that is "something more than a medical judgment call, an accident, or an inadvertent failure," *does* rise to more than gross negligence. *Harris v. Thigpen*, 941 F.2d 1495, 1505-09 (11th Cir. 1991) (internal citations omitted); *see also McElligott*, 182 F.3d at 1259.  Here, Adams plainly pled that Wilcoxson's conduct went beyond gross negligence.  Adams alleged that Wilcoxson referred him to an optometrist despite knowing his injuries required timely referral to an ophthalmologist; therefore, not only did Wilcoxson choose an easier but less efficacious treatment, but also his treatment was so cursory that it amounted to no treatment at all.  *See* ECF No. 38 ¶

154; *see also McElligott*, 182 F.3d at 1257-59 (finding negligence rises to deliberate indifference when a prison healthcare provider knew a course of treatment would not be effective but declined to do anything further to improve the inmate's condition); *Harris*, 941 F.2d at 1509 (holding constitutionally adequate care requires "minimally competent physicians"). Accordingly, Adams sufficiently pled that Wilcoxson's conduct was more than gross negligence and violative of the Eighth Amendment.

### C.    Causation

The final requirement for a deliberate indifference claim is a showing that the defendant's conduct caused the constitutional deprivation alleged. *Cottone*, 326 F.3d at 1360. Despite Defendants' argument to the contrary, Adams sufficiently pled causation. Adams alleged that UM Reviewer Defendants reviewed requests for medical treatment but ignored, denied, or delayed needed care, *see* ECF No. 38. ¶¶ 82-84, 142-48, resulting in truncated medical care, which then caused the complete cessation of treatment for his remaining injuries and the exacerbation of his pain and suffering. *Id.* ¶¶ 77-86, 147-61. Adams also pled that Wilcoxson's conduct added to the deprivation when he referred Adams to an optometrist because that treatment was cheaper despite knowing that he needed the care of an ophthalmologist. This lack of necessary and critical eye treatment caused Adams to experience permanent vision loss as well as eye pain and dysfunction. *Id.* ¶ 87, 101-13, 154-61.

Adams's SAC sufficiently alleges claims for relief against Defendants.  As noted throughout the Court's Order, the common theme here—*and as articulated in the Court's previous order, ECF No. 43*—is that any further assessment about whether Defendants acted with deliberate indifference requires a fully developed record.  *See Hand ex rel. Hand v. Fla. Dep't of Corr.*, No. 21-11542, 2023 WL 119426 at *7-8 (11th Cir. Jan. 6, 2023) (assessing deliberate indifference "*takes us beyond*" a 12(b)(6) motion) (emphasis in the original).  At this stage, Adams has made a plain statement for relief and no additional factual detail is required.

Accordingly, Nobles, Amatucci, Wexler, Sealy, and Wilcoxson's Motion to Dismiss Plaintiff's Second Amended Complaint, ECF No. 47, is **DENIED**.

**DONE AND ORDERED** this 14th day of June 2024.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**